**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEBRIA FORD, | ) | CASE NO. 1:25-CV-1460 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION** |
| SECURITY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Debria Ford's application for a period of disability and Disability Insurance Benefits (DIB). Ms. Ford seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consents, ECF No. 4; Orders [non-document], Dec. 16, 2025.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Ms. Ford's application for benefits.

## II.    PROCEDURAL HISTORY

In August 2021, Ms. Ford applied to the Social Security Administration (SSA) seeking DIB.[1] (Tr. 178.) She claimed that she became disabled on October 4, 2018. (*Id.*) She identified seven allegedly disabling conditions: (1) "stroke [with] continued problems"; (2) memory loss;

---

[1] The administrative transcript appears at ECF No. 6. The Court will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 1678"). It will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 7") and page-identification numbers (e.g., "PageID# 2854").

(3) weakness; (4) high blood pressure; (5) headaches and migraines; (6) insomnia; and (7) high cholesterol. (Tr. 201.)

The SSA denied Ms. Ford's application initially and upon reconsideration. (Tr. 72, 74, 75, 85.) Ms. Ford requested a hearing before an administrative law judge ("ALJ"). (Tr. 112.) Her counsel submitted a letter–brief in advance of the hearing. (Tr. 254–56.) The ALJ held a hearing on February 9, 2023, at which Ms. Ford was represented by counsel. (Tr. 36–60.) An independent vocational expert also testified at the hearing. (*Id.*)

On February 27, 2023, the ALJ issued a written decision finding that Ms. Ford is not disabled. (Tr. 12–31.) Ms. Ford requested review of the ALJ's decision, and her counsel submitted a letter–brief asserting alleged errors in that decision. (Tr. 172, 257–59.) The Appeals Council denied review in May 2023. (Tr. 1.)

Ms. Ford sought judicial review in this Court. *Ford v. Comm'r of Soc. Sec.*, Case No. 1:23-cv-1284-AMK (N.D. Ohio); *see also* Tr. 1741. The parties stipulated that the case should be remanded back to the agency, after which this Court ordered a Sentence Four remand. (Tr. 1741–42) The Appeals Council then vacated the ALJ's decision and remanded the matter to the ALJ with instructions for the ALJ to further consider Ms. Ford's sleep disorder to determine its severity and to reassess her maximum residual functional capacity. (Tr. 1745–48.)[2]

The ALJ held a second hearing on October 1, 2024. (Tr. 1688–1710.)

On October 11, 2024, the ALJ issued a second decision, finding that Ms. Ford is currently disabled but only became disabled in September 2024 when her age category changed. (Tr. 1658–78.) Ms. Ford again sought Appeals Council review; her counsel submitted a letter–brief

---

[2] The order notes that the ALJ had found the disorder not severe, but had failed to explain his consideration of certain abnormal findings from a sleep study and had further not adequately considered evidence that she had been prescribed medication for management of the sleep disorder. (Tr. 1745–48.)

identifying alleged errors in the decision. (Tr. 1827.) On May 16, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1651.)

On July 13, 2025, Ms. Ford filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Ford asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ erred by selectively citing evidence and minimizing consistent findings showing greater limitation than assessed in his finding of residual functional capacity.

> **Second Assignment of Error:** The ALJ improperly discounted Plaintiff's fatigue, cognitive, and language-based limitations despite consistent medical support.

(Pl.'s Merit Br. at 17, 21, ECF No. 7, PageID# 2854, 2858.)

## III. BACKGROUND

### A. Personal, Educational, and Vocational Experience

Ms. Ford was born in September 1969 and was 51 years old on the date of her application. (*E.g.*, Tr. 178.) She graduated high school and completed some courses in cosmetology and dentistry. (Tr. 202.)

Ms. Ford last worked in 2018 as a phlebotomist and charge technician at a hospital laboratory. (Tr. 202–03, 249.) She had worked in that role since 2006. (*Id.*) Prior to that work, Ms. Ford worked as a machine worker and a cashier. (Tr. 1879.)

Ms. Ford lives alone. (Tr. 41.) She is able to drive. (*Id.*) She has an adult son. (Tr. 50.)

### B. Function Report

In seeking reconsideration of the initial denial of her application, Ms. Ford informed the agency that she "still can't sleep," "does not want to get out of bed, does not want to do anything" and is not able to "do much" even when she tries. (Tr. 213.) She said she cannot do yard work, clean her house, or do laundry or cooking. (*Id.*) She cannot walk around the grocery store for long

3

before needing to sit down. (*Id.*) She has people help her bring in groceries and cook for her. (*Id.*) Her fatigue and migraines have gotten worse, to the point that she cannot concentrate for very long. (*Id.*) But she said she "can still take care of her daily activities," although she uses an alarm to remember to take her medications. (Tr. 215.)

       **C.**      **<u>Relevant Hearing Testimony</u>**

       **1.**      ***Ms. Ford's Testimony***

Ms. Ford testified at the first hearing that she worked as a phlebotomist at a hospital since at least 2008. (Tr. 42.) She worked between 50 and 60 hours per week, and she was in a charge role on the weekends. (Tr. 42–43.)

Ms. Ford had a stroke in 2018 that caused her to have blood on her brain. (*See* Tr. 48.) She described that her body has felt like she has "the flu" ever since her stroke. (*Id.*) She feels fatigued overall, especially in the "back of [her] body" and her legs. (Tr. 51.)

Now, on a typical day she does "basically nothing." (Tr. 46.) She wakes up and takes her medication. (*Id.*) Some days, her body hurts so much that she does not get out of bed. (*Id.*) When she is able to get out of bed, she will wash her face, brush her teeth, make coffee, and then watch television. (*Id.*) Sometimes, when she gets up from sitting, she cannot walk. (*Id.*)

Ms. Ford cannot shovel snow or rake leaves. (Tr. 47.) She cannot carry a laundry basket, so when she does laundry she will put her clothes in a garbage bag and roll the bag down the stairs. (Tr. 52.)

Ms. Ford testified that she went to speech therapy for a time, until the staff told her she was "done." (Tr. 52–53.) She also had a physical examination that showed weakness in the left side of her body. (*Id.*) She continues to have trouble with words and spelling. (*See* Tr. 49.) The Court notes that, at the hearing, Ms. Ford repeatedly mixed up the words "rake" and "shovel" in her testimony. (*See* Tr. 46–47, 51.) Ms. Ford said she has difficulty remembering recipes. (Tr. 51.) She put signs

on her door, reminding her to lock her door before bed. (*Id.*) She loses her keys. (Tr. 52.) She once left a sink running, causing it to overflow and spill all over the floor. (*Id.*)

Ms. Ford plays games that were given to her by a speech therapist to help with reading and remembering words. (Tr. 47.) She said her reading ability was "horrible." (Tr. 54.) She cannot remember numbers and certain names. (Tr. 54–55.)

Ms. Ford tried to volunteer at a high school after her stroke, but her doctors told her to avoid long exposure to the sun. (Tr. 48–49.)

Ms. Ford said that "everything scares [her]" now. (Tr. 50.)

If Ms. Ford walks through the entire grocery store, she finds her body hurting by the time she gets to the checkout line. (Tr. 51.) She has difficulty moving after she has been sitting for a long period. (Tr. 53.) She cannot stand long enough to prepare food. (Tr. 54.) When she needs to rest, she will often sit for about 20 minutes before moving again. (Tr. 55.)

At the second hearing, Ms. Ford testified that she has a driver's license and drives to doctors' appointments and sometimes to the grocery store. (Tr. 1696.)

Ms. Ford described that, on a typical day, she will wake up and then try to make herself something to eat. (Tr. 1699.) She will sit down and watch television. (*Id.*) She completes her physical therapy exercises for her legs and knees. (*Id.*) She will sometimes sit on the porch. (*Id.*) Ms. Ford does her own laundry approximately once per month, using machines that are located in her basement. (*Id.*) She prepares her own meals, but doing so causes her body to hurt and she finds that she is too fatigued to eat. (*Id.*) She shops for groceries at the store around once per month, but she finds that she cannot stand for long. (Tr. 1699–1700.) On one occasion, she left her groceries in the store and left, crying, due to the pain. (Tr. 1700.)

Ms. Ford does not attend church. (*Id.*) She was interested in volunteering at a local school, but her inability to walk and her anxiety prevented her from doing so. (*Id.*) Ms. Ford described that she is "really scared" to go outside because the world is different and "kids are crazy" now. (*See* Tr. 1700–01.) She is afraid of people; if there is a strange car on her street, she will go inside and lock the door. (Tr. 1701.)

Ms. Ford testified that she gets around four or five hours of sleep per night, and she spends the night "toss[ing] and turn[ing]." (*Id.*) Her sleep is "horrible." (*Id.*)

Ms. Ford said that her body has not stopped hurting since her stroke. (Tr. 1702.) Her body is weaker on the left side, so she has trouble with certain tasks like opening the ice tray in her refrigerator. (*Id.*) Her sleep trouble, depression, and fatigue have been present since her stroke. (Tr. 1702–03.) She feels like she constantly has "the flu," no matter what she does. (Tr. 1704.)

Ms. Ford testified that her concentration is "horrible"; she will go upstairs and forget why she did so. (Tr. 1703.) She will forget her keys on the porch. (*Id.*) She tried to write a letter and could not finish. (*Id.*) She has left the water in the sink on several times, causing flooding. (*Id.*) She will forget things after fifteen minutes. (Tr. 1703–04.) She still has trouble with certain words, and her reading ability is "terrible." (*Id.*)

### 2.    *Vocational Experts' Testimony*

Kathleen Reis testified as a vocational expert ("VE") at the first hearing. (Tr. 57.) The VE characterized Ms. Ford's past relevant work of that of a phlebotomist (DOT 079.364-022) and a "lab clerk" (DOT 222.587-026). (*Id.*)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Ford's age, education, and work experience is capable of work at the light exertional level, with additional limitations. (Tr. 58.) Specifically, the person can frequently climb ramps and stairs but cannot climb ladders, ropes, or scaffolds. (*Id.*) Their work can require no more than frequent "speaking

on the job." (*Id.*) They can never work near unprotected heights or dangerous moving machinery. (*Id.*) They can understand, remember, carry out, and complete simple repetitive tasks with no strict production rate pace requirements. (*Id.*) They can adapt to routine workplace changes. (*Id.*)

The VE testified that such a person could not perform Ms. Ford's past relevant work but could perform the work of a cashier II (DOT 211.462-010), housekeeping cleaner (DOT 323.687-014), or merchandise marker (DOT 209.587-034). (Tr. 58–59.) The VE confirmed that the mental limitations from the hypothetical question would limit a person to unskilled work. (Tr. 59.) The VE testified that employers will tolerate an employee who is off task up to 15 percent of the workday. (*Id.*)

George Coleman testified as a VE at the second hearing. (Tr. 1704.) The ALJ asked the VE to assume that a hypothetical individual with Ms. Ford's age, education, and work experience is capable of work at the light exertional level, with additional limitations. (Tr. 1705.) Specifically, the person can frequently climb ramps and stairs but cannot climb ladders, ropes, or scaffolds. (*Id.*) Their work can require no more than frequent "speaking at work." (*Id.*) They can never work at unprotected heights or near dangerous moving machinery. (*Id.*) They can understand, remember, carry out, and complete simple instructions with no strict production rate pace requirements (like assembly line work). (*Id.*) They can adapt to only routine workplace changes. (*Id.*)

The VE testified that such a person could perform the work of an office helper or clerical assistant (DOT 239.567-010), mailroom clerk (DOT 209.687-026), or cafeteria attendant (DOT 311.677-010). (Tr. 1705–06.)

The VE testified that employers will tolerate up to 10 percent off-task time and one absence per month. (Tr. 1706–07.)

Ms. Ford's counsel asked the VE to further limit the hypothetical individual to one-step tasks and to superficial interaction with others. (Tr. 1707.) The VE testified that no competitive work would be available to such a person, explaining that the "hard limitation" to one-step tasks (as opposed to, say, a limitation to one to two step tasks) would impede the essential functions of even unskilled work. (*See* Tr. 1707–08.)

### D.        State Agency Consultants

A disability examiner (Jennifer Maxson), a physician (Mehr Siddiqui, M.D.) and a psychologist (Mary Hill, Ph.D.) reviewed Ms. Ford's claim at the initial review level. (Tr. 61–74.)

Dr. Hill opined that Ms. Ford had moderate limitations in her ability to understand, remember, and apply information; to concentrate, persist, and maintain pace; and to adapt and manage herself. (Tr. 66.) No limitation was noted in Ms. Ford's ability to interact with others. (*Id.*) Dr. Hill found that Ms. Ford was capable of understanding, remembering, and carrying out simple one- or two-step instructions. (Tr. 70.) She is able to remember "work like procedure[s] and locations for repetitive work" within a "learned routine" and in a structured and predictable work setting without stringent time or pace demands. (Tr. 70–71.)

Dr. Siddiqui opined that Ms. Ford remained capable of standing or walking for six hours and sitting for six hours in an eight hour workday. (Tr. 68.) He limited Ms. Ford to occasionally lifting and carrying up to 20 pounds and frequently up to 10 pounds. (*Id.*) Dr. Siddiqui noted that an examination from September 2021 showed normal bulk and tone, intact sensation, normal coordination, and a stable gait. (*Id.*) He limited Ms. Ford to frequent climbing of ramps and stair and no climbing of ladders, ropes, or scaffolds. (Tr. 69.) He opined that Ms. Ford was limited to frequent speaking due to "mild expressive aphasia." (*Id.*) He limited Ms. Ford from exposure to unprotected heights and hazardous machinery. (Tr. 70.)

Based on these opinions, the consultants determined that Ms. Ford could perform the work of a flagger (DOT 372.667-022), marker (781.687-042), or car wash attendant (DOT 915.667-010). (Tr. 72.)

The consultants therefore found that Ms. Ford was not disabled. (*Id.*)

In a letter explaining the decision to Ms. Ford, the agency wrote that it found her "able to complete simple and low stress work tasks which do not require heavy lifting." (Tr. 95.)

A disability examiner (Katharine Brodzeller), a physician (W. Scott Bolz, M.D.), and a psychologist (Karla Delcour, Ph.D.) reviewed Ms. Ford's claim at the reconsideration level. (Tr. 75–85.)

Drs. Bolz and Delcour opined that the findings at the initial level are "reasonable and well supported." (Tr. 79, 82.)

Based on these opinions, the consultants affirmed the initial findings and opined that Ms. Ford could perform the work of a router (DOT 222.587-038), order caller (DOT 209.667-014), or call-out operator (DOT 237.367-014). (Tr. 85) The consultants affirmed that Ms. Ford was not disabled. (*Id.*)

In a letter to Ms. Ford, the agency wrote that she remains able to "walk, stand and move about adequately" and is "able to think, communicate and care for [her] own needs." (Tr. 106.)

### E.      **Relevant Medical Evidence**

Ms. Ford presented to a hospital emergency department on October 4, 2018, complaining of mental status changes and memory loss over the preceding three days. (Tr. 440.) She was found to be alert and oriented, but she had difficulty in conversation, could not remember her child's name, and began putting her clothes on over her hospital gown. (*Id.*) She had mild to moderate expressive aphasia. (Tr. 450.) Imaging revealed evidence of an ischemic stroke. (*See* Tr. 443.)

9

Upon discharge five days later, doctors assessed that she was in a condition to see to her own affairs without assistance but was unable to carry out all her previous activities. (Tr. 471.)

By the time that Ms. Ford followed up with a provider on October 11, 2018, she had quit smoking and begun taking medication to manage her blood pressure; she said that her memory issues had been improving. (Tr. 436.) She had no difficulty finding words on examination. (Tr. 437.)

Ms. Ford began outpatient speech therapy on October 18, 2018. (Tr. 432.) The therapist noted communication impairments, including that Ms. Ford needed extra time and "occasional repetition or rephrasing" during "higher level conversation." (Tr. 434.) She had some word-finding difficulty but spoke fluently in mostly complete sentences. (*Id.*) The therapist recommended continued therapy and opined that Ms. Ford had an excellent prognosis for improvement with time and therapy. (Tr. 432.)

At a follow-up medical appointment on October 29, 2018, Ms. Ford expressed that she was anxious to return to work and driving. (Tr. 427.) She said her symptoms had improved, although she was continuing to have difficulty reading. (*Id.*) On examination, Ms. Ford's ability to name objects was impaired (she named three out of five objects), as was her ability to read with fluency. (Tr. 429.) She displayed good attention, her ability to repeat was intact, and her speech was fluent. (*Id.*) Her strength and sensation were normal, and she walked with a "narrow-based, normal spaced and stable" gait. (*Id.*)

When Ms. Ford next met with her speech therapist, she displayed fewer instances of difficulty with naming objects. (Tr. 425.) Ms. Ford found home exercises frustrating, but she said her naming troubles were getting better, and her therapist noted that she had shown an "[e]xcellent

10

response" to therapy. (Tr. 425–26.) The therapist noted that Ms. Ford had mild to moderate reading impairment. (*Id.*)

By November 2018, Ms. Ford was beginning to write several sentences using her work team's medical abbreviations. (Tr. 423.) While she continued to experience occasional moments of anomia and paraphasia when writing, her therapist noted that she was making "excellent progress" and had been using word-retrieval strategies well. (*Id.*) She was able to balance her checkbook, although it took a while, and she was able to count money and tell time; she also said her ability to send text messages was improving. (Tr. 415 (also, "no moments of anomia during conversation today")).

Ms. Ford underwent a simulated driving assessment and was cleared to take an on-the-road assessment, with the occupational therapist concluding that her mental examination was within normal limits for driving. (Tr. 421–22.) Ms. Ford passed her road assessment, too, with the occupational therapist noting that she "was able to hold a conversation with therapist and multi-task throughout the drive . . . without any issues." (Tr. 414.)

At a cerebrovascular follow up appointment on November 26, 2018, Ms. Ford expressed a desire to return to work, but she said she did not believe she would be able to do her job. (Tr. 409–10.) She was tearful and said she was not progressing as quickly as she would like. (*Id.*) On examination, the nurse practitioner noted mild expressive aphasia and mild word finding difficulties, although Ms. Ford was able to use compensatory measures to overcome the word finding difficulties. (Tr. 411.) Her reading ability was impaired but improved, and she could read three out of five sentences on stroke assessment cards. (*Id.*) Ms. Ford endorsed symptoms of depression and anxiety, but she declined an antidepressant medication. (Tr. 411–12.)

11

Ms. Ford's speech therapist continued to note steady improvement through appointments in December 2018, with Ms. Ford seemingly exhibiting the most difficulty and frustration with reading. (*See* Tr. 408, 406, 405, 404.)

At primary care appointments around this time, Ms. Ford complained of sleepiness and was advised to exercise and counseled on good sleep hygiene. (Tr. 400, 402, 416, 418.) She was recommended for a sleep apnea study but declined. (Tr. 402.)

At a speech therapy re-evaluation on January 3, 2019, Ms. Ford was assessed to have mild expressive aphasia, mild alexia, and mild to moderate agraphia. (Tr. 398.) Her aphasia quotient from the Western Aphasia Battery was just below the cut-off for normal. (Tr. 397.) The therapist noted that Ms. Ford was able to "talk[] around" forgotten words to avoid a communication breakdown. (Tr. 398.) She was often aware of her spelling errors and used her phone to correct her spelling. (*Id.*) The therapist opined that Ms. Ford may be able to go back to work with "some accommodations for language deficits." (*Id.*)

At a cerebrovascular follow up appointment with neurologist Jayashree Sundararajan, M.D., on January 15, 2019, Ms. Ford said she had significant trouble reading but her comprehension had improved. (Tr. 389.) She said she was still having some difficulty finding words. (*Id.*) She complained of head pain but had difficulty describing the quality of the pain. (*Id.*)

Ms. Ford showed slow but steady improvement at her speech therapy appointments in January and early February 2024; she was able to read a short news article and was focusing on accurately writing names and dates of birth (tasks needed to return to her work as a phlebotomist). (Tr. 382, 384–85, 387.)

Ms. Ford went to a walk-in medical facility on February 15, 2019, complaining of headaches, high blood pressure, and a swollen eye. (Tr. 379.) She was recommended to the

emergency department due to her history of stroke. (Tr. 379–80.) She complained of a headache at the hospital, but physicians quickly noted that she was asymptomatic in that regard and was primarily there "due to acute psychological stress" related to recently being laid off, a friend's significant illness, and difficulty adjusting to new limitations since having her stroke. (Tr. 376.) Physicians noted that her symptoms were most consistent with adjustment disorder. (Tr. 379.) She declined to take a selective serotonin reuptake inhibitor (SSRI) but said she was open to a psychology referral. (Tr. 378.) She asked for medication to help her sleep and was instructed to take melatonin and over the counter diphenhydramine until she could follow up with her primary care physician and a behavioral health clinic. (Tr. 378–79.)

Ms. Ford's speech therapist noted steady progress and "nice improvements" in Ms. Ford's written expression at the end of February 2019. (Tr. 374–75.)

Ms. Ford followed up with a primary care physician, Stacey Jolly, on March 1, 2019. (Tr. 370.) She said that she had washed her car outside and felt "very good" after that. (*Id.*) Ms. Ford said she does not exercise but was trying to eat better. (Tr. 371.) On examination, Ms. Ford presented with a pleasant mood. (Tr. 372.) Ms. Ford was continued on her current treatment plan; Dr. Jolly discussed a psychological consultation, but Ms. Ford declined. (Tr. 373.)

Ms. Ford's speech therapist identified continued steady progress "with notable improvements in written expression" at appointments throughout March and April 2019. (Tr. 368–69, 365, 364, 363, 356–57). There are instances where Ms. Ford complained of fatigue and trouble sleeping, or intermittent headaches. (Tr. 360, 364.) Ms. Ford told a provider that she cooks "a lot" at home, including every Sunday, and she started walking for exercise. (Tr. 357, 358.) By April 11, 2019, Ms. Ford was having "only very rare moments of anomia" and was making improvement in reading comprehension and written expression. (Tr. 358.)

On May 2, 2019, Ms. Ford's speech therapist characterized her expressive aphasia as "very mild" and her agraphia and alexia as mild "but demonstrating steady improvements." (Tr. 355.)

Ms. Ford underwent neuropsychological testing on May 6, 2019, with Richard Naugle, Ph.D. (Tr. 347.) Ms. Ford was "able to express herself without appreciable difficulty throughout the interview," but she expressed distress about feeling out of control of her life due to communication difficulties. (*Id.*) She had "some difficulty" with word finding "and at times required elaboration and repetition of instructions." (*Id.*) But she was alert and attentive throughout, she tolerated frustration in response to more demanding measures, and she consistently seemed to be working to the best of her ability. (*Id.*) Dr. Naugle opined that her performance on various tests was "entirely consistent with frontal dysfunction within the language-dominant hemisphere" and the other medical records showed "considerable recovery" since the stroke. (Tr. 348.) In the course of casual conversation, Ms. Ford was able to "compensate for her word finding difficulty with relative ease." (*Id.*) Dr. Naugle opined that Ms. Ford "will likely function most effectively in those situations that are familiar to her and when undertaking tasks with which she has experience." (*Id.*)

Ms. Ford continued showing improvements in speech therapy from May through August 2019. (Tr. 345, 344, 342–43, 341, 336.)

Dr. Sundararajan opined in August 2019 that Ms. Ford was not currently able to return to her work as a phlebotomist but "can attempt other positions that have a set routine." (Tr. 335.) Ms. Ford said she had occasional headaches, but she denied in January 2020 that her headaches were frequent or severe. (Tr. 328, 331.) She missed an appointment the same month because she had been swimming. (Tr. 327.)

14

Ms. Ford was noted to still have mild expressive aphasia at a neurology consultation with certified nurse practitioner Susan Jaeger on February 7, 2020. (Tr. 323.) Ms. Ford said that her memory was getting better, she was able to drive, and she had signed up for a gym membership. (Tr. 322.)

On February 10, 2020, Ms. Ford told a provider that her sleep was better and she had been swimming. (Tr. 318.) She had not been running because her ankle was sore. (*Id.*)

When Ms. Ford next met with her speech therapist, her verbal expression scores had improved ("10/10"). (Tr. 315.) She continued to exhibit mild expressive aphasia but "demonstrated excellent ability to use semantic circumlocution" to prevent a breakdown in communication at those times. (Tr. 316.)

Ms. Ford continued with speech therapy, and it was consistently noted that she was actively participating with continued mild aphasia and agraphia, most prominent in structured reading tasks. (*See* Tr. 312, 311, 310, 308, 307, 305.)

Ms. Ford was re-evaluated by Dr. Naugle on June 30, 2020. (Tr. 303.) The objective testing revealed, among other things, difficulties in flexible thinking and problem solving, and she had "some difficulty" generating alternative problem solving strategies. (Tr. 304.) Overall, the examination revealed residual difficulty with expressive language, "particularly confrontation naming and timed phonemic fluency." (*Id.*) She also had difficulty on tests assessing attention, free recall of non-contextual verbal material, and flexible thinking and problem solving. (*Id.*) But her delayed recognition of verbal rote learning was much better preserved than in her previous examination. (*Id.*) While Dr. Naugle reported these findings, he also noted that Ms. Ford appeared distressed during the examination. (*Id.*) He concluded, based on his observations and the test scores, that "psychological factors were contributing to her presentation." (*Id.*) He opined that Ms.

15

Ford's "actual level of functioning on a day-to-day basis might be somewhat higher than suggested by these test results" and recommended that she be referred to a health psychologist. (*Id.*)

Her speech therapist noted largely stable limitations at an appointment in July 2020. (Tr. 302.)

Ms. Ford followed up with Ms. Jaeger on August 4, 2020. (Tr. 296.) She complained of fatigue and body soreness, but she said she was swimming at a recreation center three or four times a week. (Tr. 297.) She continued to have mild expressive aphasia. (Tr. 300.)

Ms. Ford's status and abilities seemingly remained stable through speech therapy appointments in August and September 2020. (Tr. 296, 294–95.) At an appointment with a primary care doctor, Kathryn Dere, M.D., on September 11, 2020, Ms. Ford said that her reading and writing troubles were "getting better slowly." (Tr. 290.) She was remembering more recipes. (*Id.*) She occasionally wakes up tired, but not all the time. (*Id.*) On examination, she was "conversant" with "intact language." (Tr. 291.)

Ms. Ford did not show up for a scheduled speech therapy appointment on September 16, 2020. (Tr. 288.)

On November 9, 2020, Dr. Dere completed a form in support of Ms. Ford's application for long term disability. (Tr. 261.) He opined that Ms. Ford had improved and was ambulatory since her stroke. (*Id.*) But he further checked a box that Ms. Ford was "totally disabled" and was capable only of sedentary activity. (Tr. 262.) He indicated that Ms. Ford was not expected to be permanently disabled, but he wrote that she continues to have "significant deficits in memory [and] planning skills needed for the job" and needed to continue building her strength. (*Id.*)

Ms. Ford underwent a consultative examination with Joseph Konieczny, Ph.D., on December 1, 2020. (Tr. 264.) Ms. Ford reported crying spells two to three times per week, but she

denied any history of depression. (Tr. 265.) Throughout the interview, Ms. Ford displayed no obvious indications of aphasia and "she seemed quite capable of expressing herself in a clear and coherent manner." (Tr. 265.) She said that she had sleep difficulties due to racing thoughts. (Tr. 266.) But her ability to concentrate and attend to tasks showed no indication of impairment during testing. (*Id.*) IQ and memory testing revealed "scatter[ed]" results, leading to "patchy but significant" declines in some areas of functioning. (Tr. 267–68.) Dr. Konieczny opined that Ms. Ford would have some limitations in her ability to understand, remember, and carry out instructions, would have some diminished tolerance for frustration and diminished coping skills to respond to "severe supervision and interpersonal situations" and stressful situations in the workplace. (Tr. 268.) But the doctor opined that Ms. Ford remained capable of responding appropriately in "normal situations." (*Id.*)

Ms. Ford underwent a physical capacity evaluation on January 26, 2022. (Tr. 677.) The administrator noted segmental inconsistencies resulting in mild sub-maximal effort and opined pain could have been considered while making functional decisions. (*Id.*) Ultimately, the examiner concluded that she could perform sedentary work and just over half of her previous job duties as a phlebotomist. (Tr. 677–78.)

On February 2, 2022, Dr. Dere completed another statement in which she opined that Ms. Ford was not able to perform medium-capacity work and would be off task for 25 percent or more of the workday. (Tr. 675.)

Ms. Ford began consulting with a psychotherapist on March 17, 2022. (Tr. 685.) She complained of memory, concentration, and mood difficulties, crying spells, poor sleep, and anxiety (Tr. 686.). On examination, Ms. Ford was tearful and talkative; her anxiety and depression were "high." (Tr. 688.)

17

At an appointment with Dr. Sundararajan on March 31, 2022, Ms. Ford reported difficulty with planning her meals and shopping and said she got tired easily. (Tr. 1099.) On examination, her speech was fluent with some receptive aphasia. (Tr. 1101.) She had difficulty with multi-step tasks. (*Id.*)

Ms. Ford underwent treatment with a therapist in 2022 that included complaints and observations of stress and tearfulness. (Tr. 1098, 1547.)

Ms. Ford underwent a consultative examination with Herschel Pickholtz, Ph.D., on May 3, 2022. (Tr. 1517.) Dr. Pickholtz opined that her verbal IQ fell within the borderline range, but her overall capacity to understand, remember, and carry out instructions for simple work activities suggested a slight impairment "if at all." (Tr. 1524.) Her capacity to understand, remember, and carry out more complex work was "slight to somewhat impaired at worst." (*Id.*) Her capacity to perform one to two step tasks did not reflect any serious impairment. (Tr. 1525.)

Ms. Ford consulted with Michael Saribalas, D.O., complaining of sleep trouble, on May 27, 2022. (Tr. 1539.) A polysomnogram was ordered. (Tr. 1543.)

Ms. Ford continued treating with a therapist; her mental status examinations were largely normal, but she described having difficulty since her stroke and endorsed financial strain. (Tr. 1535, 1537–38, 1626, 1645–46.)

A polysomnogram in June 2022 revealed hypersomnia that was not explained, as well as poor sleep efficiency and long latencies at various sleep stages. (Tr. 1552–53.)

At a psychiatric appointment with Gabriella Stamper, M.D., Ms. Ford reported difficulty explaining herself, headaches triggered by frustration or sleep troubles, and forgetfulness (Tr 1638).

A follow up sleep appointment noted "sleep-onset and maintenance insomnia," possibly related to depression and poor sleep hygiene. (Tr. 1562.) She was started on mirtazapine and weaned from Zoloft. (*Id.*)

In October 2022, Ms. Ford was in an altercation with a woman at a funeral when she was sprayed with a self-defense spray, after which she was treated in an emergency room. (Tr. 2036.)

On October 25, 2022, Ms. Ford endorsed frequent crying since a friend passed away, poor sleep, low energy, and anxiety about leaving her home. (Tr. 1610–13.) A mental status examination was unremarkable. (Tr. 1612.)

Ms. Ford continued in physical therapy. (Tr. 2032, 2029, 2027, 2025, 2021, 2018.)

At a neurology appointment on December 9, 2022, examination revealed a negative attitude, an increased speech rate and tone at times, tangential and somewhat circumstantial reasoning, and labile and slightly irritable affect. (Tr. 2015.) Medication changes were made later that month. (Tr. 1604.)

Ms. Ford complained of occasional headaches in December 2022; she described having left sided weakness and memory loss, along with sleep trouble and depression (but medication was helping). (Tr. 1933, 1935.)

Ms. Ford was discharged from physical therapy in December 2022 "due to goal achievement and maximal benefit." (Tr. 1991.)

Ms. Ford consulted with Dr. Sundararajan on February 16, 2023. (Tr. 1980.) She complained of significant anxiety but said that she was able to see to all her activities of daily living. (*Id.*) She was still swimming occasionally. (*Id.*) Dr. Dunn opined that Ms. Ford was unable to return to work. (Tr. 1985.)

On March 3, 2023, Ms. Ford reported continued sleep trouble and was working on her sleep hygiene. (Tr. 1904.)

At an appointment on April 26, 2023, Ms. Ford's speech therapist found that her mild expressive aphasia was stable from her last appointment, but "poor sleep and mood" were "significantly impacting cognition." (Tr. 1965.) Ms. Ford reported babysitting for her two-year-old grandson. (Tr. 1966.) She described memory trouble, fatigue, and trouble with words, among other things. (*Id.*)

Ms. Ford continued with speech therapy and psychological appointments. (*E.g.*, Tr. 2150, 2054–69.)

Ms. Ford's speech therapist noted on June 6, 2023, that she was tearful and frustrated; she had experienced difficulty getting to the appointment. (Tr. 1951.) The therapist continued to opine that her mental condition was stable but "poor sleep and mood" were "significantly impacting [her] cognition." (Tr. 1952.)

On June 22, 2023, Ms. Ford underwent a neuropsychological evaluation with Katherine Reiter, Ph.D. (Tr. 1946.) Dr. Reiter noted that Ms. Ford's task engagement seemed "suboptimal," so she couched her conclusions with the advisement that the results were not a valid indicator of her current functioning. (Tr. 1948.) Dr. Reiter opined that the behavioral observations were consistent with anomia, but "further characterization of aphasia cannot be completed due to suboptimal task engagement." (Tr. 1948–49.)

Ms. Ford had a pap smear in December 2023, after which a fibroid was removed. (Tr. 2785.) Laboratory testing confirmed a carcinoma with papillary features. (Tr. 2782.)

On December 31, 2023, Ms. Ford was treated in the emergency department for a syncopal episode. (Tr. 2679).

20

On January 22, 2024, Ms. Ford missed a speech therapy appointment because she had thought her appointment was at a different time. (Tr. 2697.)

Ms. Ford continued to report feeling depressed at an appointment on January 25, 2024. (Tr. 2767.)

Ms. Ford complained to a provider that she had left knee pain in August 2024. (Tr. 2812.)

Ms. Ford consulted with Heather Rainey, M.D., regarding knee pain on September 3, 2024. (Tr. 2806.) After imaging, she was cleared to engage in activity as tolerated, and she was referred to physical therapy for muscle strengthening. (Tr. 2810.)

## IV. THE ALJ'S DECISION

The ALJ found that Ms. Ford met the insured status requirements of the Social Security Act through December 31, 2024. (Tr. 1664.) The ALJ further found that Ms. Ford had not engaged in substantial gainful activity since October 4, 2018, the alleged onset date. (*Id.*)

The ALJ next determined that Ms. Ford had the following severe impairments: (1) vascular insult to the brain (2018); (2) neurocognitive disorders; (3) obesity; (4) sleep disorders; (5) depressive disorders; and (6) anxiety disorders. (*Id.*)

The ALJ noted that Ms. Ford had a non-severe impairment of hypertension, finding that the condition was controlled with medication. (*Id.*) The ALJ declined to find a medically determinable impairment of migraines or a primary headache disorder. (Tr. 1664–65.)

The ALJ then concluded that none of Ms. Ford's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1665.)

The ALJ determined that Ms. Ford had the residual functional capacity ("RFC") to perform work at the light exertional level with a number of additional limitations. (Tr. 1667.)

With respect to exertional and environmental limitations, Ms. Ford can frequently climb

ramps and stairs but can never climb ladders, ropes, or scaffolds. (*Id.*) She is able to speak no more than frequently. (*Id.*) She must never work at unprotected heights or around dangerous moving machinery. (*Id.*)

With respect to non-exertional limitations, Ms. Ford can understand, remember, carry out, and complete simple instructions with no production-rate pace requirements (like assembly line work). (*Id.*) She can adapt to routine changes in the workplace. (*Id.*)

The ALJ concluded that Ms. Ford had at least a high school education and no past relevant work. (Tr. 1676.) The ALJ found that Ms. Ford was in the administrative age category of "younger individual" (ages 18 to 49) until September 2024, when her age category changed to "individual of advanced age." (*See id.*)

The ALJ then determined that—considering Ms. Ford's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could have performed until September 2024, including work as an "office helper" (DOT 239.567-010), "mailroom clerk" (DOT 209.687-026), or "cafeteria attendant" (DOT 311.677-010).[3] (Tr. 1676–77.) Accordingly, the ALJ concluded that Ms. Ford was not disabled before September 2024. (Tr. 1677–78.)

Finally, the ALJ found that Ms. Ford became disabled in September 2024 when her age category changed. (*Id.*)

---

[3] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

V.      LAW & ANALYSIS

        A.      <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

23

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.     Standard for Disability

To establish entitlement to DIB, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency

24

regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g). *See Abbott*, 905 F.2d at 923.

### C.   Analysis

#### 1.   Evaluation of Objective Medical Evidence

In her first assignment of error, Ms. Ford argues that the ALJ "selectively parsed the evidence" and failed to properly articulate his analysis of the evidence when crafting the RFC. (Pl.'s Br., ECF No. 7, PageID# 2854.) She admits that the ALJ acknowledged that Ms. Ford experienced stroke-related language deficits, fatigue, and cognitive symptoms, but she contends

25

that the ALJ then "highlighted isolated findings of improvement or normality while minimizing substantial, longitudinal evidence supporting more restrictive limitations." (*Id.*)

The Commissioner defends the ALJ's decision as a thorough discussion of the objective evidence, including examination results from visits to psychologists and neurologists. The Commissioner points out that the ALJ accurately noted where providers listed unremarkable findings on examination. And the Commissioner contends that Ms. Ford's argument is merely a request to reweigh the evidence.

After careful consideration, the Court agrees with the Commissioner that the ALJ did not engage in improper "cherry picking" here.

As an initial matter, courts in this Circuit are generally skeptical of arguments that an ALJ "cherry picked" the record for evidence supporting the ALJ's conclusion. As the Sixth Circuit has stated, "claims that the ALJ 'cherry-picked' the record are 'seldom successful' because they essentially amount to a request that the court 're-weigh record evidence,' which [a court] may not do." *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)); *see also White*, 572 F.3d at 284 (noting that accusations of cherry picking "can be described more neutrally as weighing the evidence").

Moreover, here the ALJ specifically referenced Ms. Ford's testimony about her symptoms and accurately summarized her treatment history. The ALJ cited medical records showing that Ms. Ford's anomia and alexia symptoms persisted despite treatment.

With respect to Ms. Ford's testimony, the ALJ wrote as follows:

> In written reports and at both hearings, the claimant alleged disability due to a combination of physical and mental impairments. The claimant testified at the February 2023 hearing that she had good days and bad days including days she did not get out of bed. On these days, the claimant testified that she had pain in the back of her body and legs. The claimant endorsed having a stroke. The claimant indicated that she was scared to go out because of

Covid. The claimant testified that she did not have the energy to do chores like shovel snow or rake leaves. The claimant endorsed problems with memory such as remembering recipes when cooking. The claimant testified that she forgets things such as running water or where her keys are. The claimant testified that she had done speech therapy. The claimant testified that she reentered physical therapy in October 2022. The claimant testified that she sometimes did not have the energy go downstairs. The claimant endorsed problems moving and getting up. The claimant testified that she had problems standing and could not wash a sink of dishes or wash vegetables. Following this, the claimant indicated that she needed to sit down and rest for 20 minutes. The claimant endorsed problems reading and remembering numbers and names.

During the February 2023 hearing, the claimant testified that she lives alone and drives to medical appointments and shopping. On a typical day, the claimant testified that she cared for hygiene such as brushing her teeth. The claimant indicated that she could no longer shovel snow or rake leaves. The claimant testified that she had fallen the last time she tried to shovel snow. The claimant testified that she watched television. The claimant testified that she had tried to volunteer as a cheerleading coach but did not have the energy or ability to come up with cheers. The claimant testified that she experienced body pain when waiting in a line at a store. The claimant endorsed problems lifting and carrying laundry.

At the October 2024 hearing, the claimant offered similar allegations. However, she provided addition testimony regarding sleep disorder. Sleep is limited to about 5 hours per day. She described insomnia, fatigue, and daytime sleepiness. She has headaches and reduced concentration due to the sleep issues. The claimant is not able to nap during the day. There is pain in the left side of the body. The pain feels similar to flu symptoms. These symptoms limit the amount of time she can participate in any activities. The claimant stated that she no longer attends church. She grocery shops, fixes something to eat, does some chores (one at a time), works on home exercises, and sits on the porch. She does laundry in the basement.

(Tr. 1668–69.)

The ALJ acknowledged that Ms. Ford had a "cerebrovascular accident" in October 2018 and experienced aphasia from the stroke, but the ALJ accurately noted that it was consistently described as "mild" and responded to therapy. (Tr. 1669.) The ALJ summarized her treatment history and evaluations over several pages in the decision. (Tr. 1669–72.)

27

The ALJ also acknowledged Ms. Ford's activities of daily living, which could support a conclusion that Ms. Ford's conditions do not prevent her from completing simple instructions in a position that does not require a production-rate pace and adapt to routine changes in the workplace.

Thus, the ALJ discussed both positive and negative evidence regarding Ms. Ford's post-stroke impairments, concluding that those impairments placed limitations on her ability to work, but that they were not so severe as to render her disabled. Ms. Ford believes that the ALJ should have relied more heavily on evidence supporting her position. As noted above, however, the Court may not overturn the ALJ's decision merely because evidence in the record would have supported a different conclusion, so long as the ALJ's decision is supported by substantial evidence. *Jones*, 336 F.3d at 477.

Ms. Ford contends that the ALJ failed to grapple with formal testing showing frontal-lobe dysfunction and mild aphasia, but the Court disagrees that the ALJ improperly minimized these findings in the decision. The ALJ discussed consultative examinations and opinion evidence over several pages. (Tr. 1672–75.) Ultimately, the ALJ accurately concluded that the record reflected that Ms. Ford had continued aphasia and other symptoms, including a sleep disorder, after her stroke, but that these conditions were repeatedly characterized as mild and treated conservatively. The examination findings Ms. Ford identifies do not substantially cut against that finding, and in any event the Court may not reweigh the evidence so long as substantial evidence supports the ALJ's conclusions.

This case is not akin to *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723–24 (6th Cir. 2014), wherein the ALJ outright ignored substantial record evidence reflecting severe problems with psoriatic plaques over time in concluding that the claimant's allegations were inconsistent with the record. *Id.*, 741 F.3d at 725.

To the contrary, the ALJ accurately read the record evidence to substantiate that Ms. Ford has residual aphasia and related symptoms after her stroke, but that those symptoms are repeatedly cast as mild. The ALJ further, accurately, noted that Ms. Ford engages in activities of daily living suggesting that she is not disabled from all work. She performs household chores, shops, drives, swims, goes for walks, watches her grandson on occasion, prepares meals, and texts.

The Court is similarly unconvinced that the ALJ engaged in cherry picking when it comes to the opinion evidence. While certain treating professionals opined that Ms. Ford could not return to work, those opinions were largely directed to Ms. Ford's work as a phlebotomist. Providers also opined that she could attempt work in a different, simpler work environment. Ultimately, the ALJ credited the opinions of the state agency consultants, whose opinions are reflected in the RFC. After carefully reviewing the record, the Court cannot say that the ALJ committed reversible error in doing so.

Finally, the Court considered and rejected the argument that ALJ erred in considering Ms. Ford's sleep disorder. The ALJ acknowledged Ms. Ford's sleep troubles since the stroke, including that the records "consistently describe issues with fatigue, insomnia, and daytime sleepiness." (Tr. 1671.) But the ALJ then accurately noted that apnea was ruled out, that Ms. Ford denied napping during the day, and that providers consistently found her to be "alert" on examination. (*Id.*) The Court cannot conclude that it was reversible error for the ALJ to determine that Ms. Ford's fatigue was adequately addressed by a limitation to light exertion work with the additional limitations of the RFC.

Substantial evidence supports the ALJ's RFC here. Accordingly, Ms. Ford's first assignment of error is overruled.

### 2. Evaluation of Ms. Ford's Fatigue, Cognitive, and Language-Based Limitations

In her second assignment of error, Ms. Ford argues that the ALJ failed to properly evaluate her description of her symptoms, in violation of Social Security Ruling 16-3p. (Pl.'s Br. at 21, ECF No. 7, PageID# 2858.)

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id*. If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id*. at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id*. at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id*. at *7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

Here, as discussed above, the ALJ acknowledged Ms. Ford's descriptions of her symptoms and limitations. The ALJ concluded that her medically determinable impairments could reasonably be expected to produce those symptoms. But the ALJ then reasoned that her description of her limitations was not fully supported by the record evidence.

Ms. Ford challenges the ALJ's reasoning as "minimizing the symptoms" and says that the ALJ focused on "isolated facts of brief moments of normal mood or cooperation" while ignoring "years of evidence documenting persistent and severe cognitive and fatigue-related impairments."

This is, again, a straightforward "cherry-picking" argument. While Ms. Ford points to evidence in the record that she believes should have supported a different result, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance

31

of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision").

Here, the ALJ accurately and thoroughly summarized the treatment record and discussed Ms. Ford's activities of daily living in conjunction with the objective medical evidence. *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1006 (6th Cir. 2025) (no reversible error where the ALJ relied on the claimant's activities of daily living and "carefully analyzed the entirety of the record evidence regarding [claimant's] ability to function, using [claimant's] statements regarding her activities only as one factor among many"); *Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290-CEH, 2022 WL 2176539, at *8-9 (N.D. Ohio June 16, 2022) (holding that ALJ did not err in relying on claimant's reports of daily activities in conjunction with objective medical evidence).

The ALJ acknowledged Ms. Ford's complaints and testimony regarding aphasia, sleep difficulty, fatigue, decreased concentration, and memory deficits, among other things.

The ALJ then considered the objective medical evidence, thoroughly summarizing her treatment history, physical examination findings, and mental status examination findings—noting both abnormal and normal findings. The ALJ reasonably concluded that Ms. Ford's aphasia was mild and her sleep disorder and any difficulty concentrating were adequately addressed by the state agency consultants' opined RFC limiting her to light work and simple instructions in a work environment where she need not speak more than frequently and which does not involve more than routine changes.

32

In short, the ALJ's analysis was sufficient to satisfy SSR 16-3p. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 2026 WL 261558 (Feb. 2, 2026) (ALJ complied with SSR 16-3p where the ALJ thoroughly and accurately summarized the claimant's allegations and testimony, then reasonably found that those allegations were not fully supported, discussing and reasonably weighing the record evidence). Notably, beyond pointing to evidence that Ms. Ford wishes the ALJ had weighed differently, Ms. Ford does not suggest any specific functional limitation that she would have had the ALJ include in the RFC.

The Court is also unconvinced that the ALJ failed to adequately address sustainability when crafting the RFC.

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).

> Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

SSR 96-8p, 1996 WL 374184 at *2 (July 2, 1996) (emphasis in original).

Here, the ALJ adequately addressed Dr. Dere's opinion that Ms. Ford would be off-task. The ALJ limited Ms. Ford not just to "simple work," but to simple instructions in a role that would not require more than frequent speaking and no more than routine changes, alongside certain exertional limitations. The ALJ acknowledged the consistent notations of fatigue but explained

33

how the medical evidence and Ms. Ford's activities of daily living, among other things, convinced the ALJ that Ms. Ford would be able to sustain work of the type permitted by the RFC. The ALJ's conclusions in this regard were supported by the opinions of the state agency consultants.

After careful consideration, the Court is convinced that the ALJ's conclusion that Ms. Ford can sustain work activity on a continuing basis was supported by substantial evidence, that is "'such relevant evidence as a reasonable mind might accept as adequate to support'" the ALJ's conclusions. *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant'' position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

Here, the ALJ acknowledged Ms. Ford's statements about her limitations, thoroughly and accurately summarized the treatment record, reasonably explained how the record partially contradicted Ms. Ford's description of her limitations, and reasonably concluded that Ms. Ford remained capable of sustained work activity under the limitations set forth in the RFC. The ALJ's conclusion regarding sustained work activity was supported by the opinions of the state agency

34

medical and psychological consultants. Under these circumstances, the Court cannot find reversible error in the ALJ's conclusions.

Accordingly, Ms. Ford's second assignment of error is overruled.

## VI.  CONCLUSION

Having overruled Ms. Ford's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.

Dated:  <u>May 8, 2026</u>                    /s/ *Jennifer Dowdell Armstrong*
                                  Jennifer Dowdell Armstrong
                                  U.S. Magistrate Judge

35